**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IRVING S. BRAUN, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>BANK OF AMERICA CORPORATION, BRIAN MOYNIHAN, and ALASTAIR BORTHWICK,<br><br>Defendants. | Case No.:<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR A JURY TRIAL |

Plaintiff Irving S. Braun ("Plaintiff"), by and through counsel, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by the Bank of America Corporation ("Bank of America" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, and conference calls concerning Defendants' public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants (defined below).

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a Class of all persons or entities that purchased or otherwise acquired Bank of America common stock and/or Depositary Shares, each representing a 1/1,000th interest in a share of 4.250% Non-Cumulative Preferred Stock,

Series QQ ("Series QQ Depositary Shares") between January 20, 2022 and October 13, 2026, inclusive (the "Class Period"), against Bank of America and certain of its officers and executives (collectively, "Defendants"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Bank of America is a multinational bank holding company that primarily conducts its banking operations through its banking subsidiary, Bank of America, National Association ("BANA"). As a federally regulated bank, the Company is subject to the Bank Secrecy Act ("BSA") and related anti-money laundering ("AML") sanctions, which obligate the Company to maintain a reasonably effective compliance program—including transaction-monitoring systems, customer due diligence, and the timely filing of Suspicious Activity Reports ("SARs").

3. During the Class Period, the Company's compliance program was already failing in material respects. As regulators would later reveal, Bank of America's misconduct and violations took place from at least January 1, 2018. By 2023, the Company had begun engaging with regulators to address deficiencies in its BSA/AML and sanctions compliance programs.

4. Defendants repeatedly assured investors that Bank of America had "adopted appropriate risk management and compliance programs." Then, on December 23, 2024, the Office of the Comptroller of the Currency ("OCC") issued a consent order against BANA (the "Consent Order" or the "2024 Order"), finding that it had failed to maintain reasonably effective BSA and sanctions compliance programs, which required extensive remediation efforts by the Company.

5. Defendants subsequently told investors that it had "already completed significant steps to satisfy requirements of the Consent Order[,]" and that it did not "believe that these issues relating to the Programs will have a material adverse financial impact on the Corporation."

Unbeknownst to investors, throughout the Class Period, Bank of America's compliance program remained materially deficient, and the Company willfully failed to remedy those deficiencies, even after U.S. regulators required it to do so pursuant to the Consent Order.

6. The truth emerged after markets closed on October 13, 2026, when the U.S. Department of the Treasury issued a press release announcing enforcement actions imposing more than $1.2 billion in penalties against the Company for violations of AML and sanctions laws. The press release disclosed that BANA had admitted it "willfully violated the BSA," that its failures were widespread and longstanding, and that BANA's monitoring breakdowns caused it to "fail[] to timely report to FinCEN over $5 billion dollars in suspicious transactions," including over $1 billion tied to "national security-related and other priority illicit finance risks."

7. Critically, the OCC further found that, "[a]fter agreeing to the 2024 Order, the Bank still failed to prioritize BSA/AML compliance[,]" and BANA did "not complete many of the significant steps needed to establish an effective BSA/AML compliance program and its program continues to have significant breakdowns."

8. The next morning, before markets opened on October 14, 2026, Bank of America issued a press release announcing its third-quarter 2026 financial results, disclosing that the $1.2 billion regulatory settlement charge had reduced diluted earnings per share by $0.17.

9. Analysts chastised the Company. For example, J.P. Morgan issued a report titled "BSA/AML Consent Orders Include Surprising Comments From Regulators," explaining the action was "much more punitive because regulators concluded that BofA had not made sufficient progress." The analysts also observed that the "deficiencies cited seem quite extensive," and that the "lack of oversight by the Board on this matter" was "also surprising."

10. On this news, the price of Bank of America common stock fell $2.57 per share, or approximately 4.7%, to close at a price of $51.39 per share on October 14, 2026, while the price of Bank of America Series QQ Depositary Shares fell $0.11 per share, or approximately 0.72%, to close at a price of $15.21 per share on October 14, 2026.

11. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock and Series QQ Depositary Shares when the truth was disclosed, Plaintiff's wife, Judith Braun, and the other members of the Class have suffered significant losses and damages.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District. Bank of America's common stock trades on the New York Stock Exchange ("NYSE"), located in this District. Bank of America's Series QQ Depositary Shares trade on the NYSE and the Nasdaq, both located in this District.

15. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

16. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff Irving S. Braun is authorized to seek recovery of investment losses incurred by his wife, Judith Braun ("Plaintiff's Wife"), who purchased Bank of America Series QQ Depositary Shares during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

17. Defendant Bank of America is incorporated under the laws of Delaware with its principal executive offices located in Charlotte, North Carolina. Bank of America common stock trades on the NYSE under the ticker symbol "BAC." Bank of America Series QQ Depositary Shares trade on the NYSE under the ticker symbol "BAC PrQ" and on the Nasdaq under the ticker symbol "BAC^Q."

18. Defendant Brian Moynihan ("CEO Moynihan") was the Company's Chair of the Board and Chief Executive Officer ("CEO") at all relevant times.

19. Defendant Alastair Borthwick ("CFO Borthwick") was the Company's Chief Financial Officer ("CFO") from the fourth quarter of 2021 through the remainder of the Class Period.

20. Defendants CEO Moynihan and CFO Borthwick (together, the "Individual Defendants"), because of their positions with Bank of America, possessed the power and authority to control the contents of, *inter alia*, Bank of America's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*,

the market. The Individual Defendants were provided with copies of Bank of America's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

21. Bank of America and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

22. Bank of America is a multinational bank holding company that carries out most of its banking business through BANA. The Company is subject to the Bank Secrecy Act (BSA) and other federal laws and regulations governing anti-money laundering (AML), sanctions compliance, financial transparency, and anti-corruption practices. Accordingly, BANA is required to implement and maintain a reasonably effective compliance program to ensure adherence to the BSA and its implementing regulations.

23. Several months after the start of the Class Period, on December 23, 2024, the OCC issued a Consent Order against BANA after finding that the Company had failed to maintain reasonably effective BSA and sanction compliance programs. The OCC identified deficiencies in key elements of the BANA's compliance framework, including internal controls, independent testing, training, and oversight by the designated BSA Officer. The OCC found that BANA's processes for identifying, investigating, and reporting suspicious activity were deficient, including

failures to maintain appropriate transaction-monitoring thresholds, to dedicate sufficient resources to investigations, and to comply with Suspicious Activity Report ("SAR") filing requirements.

24. To address these deficiencies, the Consent Order required BANA to undertake extensive remedial measures, including enhanced Board oversight, independent assessments of its compliance programs, corrective-action plans, and historical transaction reviews to determine whether suspicious activity had been properly identified and reported. The Order also required ongoing reporting to the OCC regarding the status and effectiveness of the BANA's remediation efforts.

**Defendants' Materially False and Misleading Statements**

25. The Class Period begins on January 20, 2022. After markets closed on January 19, 2022, the day before, Bank of America issued a press release announcing its financial results for the fourth quarter of 2021. In the press release, the Company informed investors that they "should consider" the "risks and uncertainties more fully discussed under Item 1A. Risk Factors of the Company's 2020 Annual Report on Form 10-K." In Item 1A. Risk Factors of the referenced 2020 10-K, filed on February 24, 2021, the Company included the following risk disclosure:

> We are subject to comprehensive regulation under federal and state laws in the U.S. and the laws of the various jurisdictions in which we operate, including increasing and complex economic sanctions regimes. These laws and regulations significantly affect and have the potential to restrict the scope of our existing businesses, limit our ability to pursue certain business opportunities, including the products and services we offer, reduce certain fees and rates or make our products and services more expensive for our clients.
>
> * * * *
>
> While ***we believe that we have adopted appropriate risk management and compliance programs to identify, assess, monitor and report on applicable laws, policies and procedures***, compliance risks will continue to exist, particularly as we adapt to new and evolving laws, rules and regulations. Additionally, changing U.S. fiscal, monetary and regulatory policies arising from

> changes to the U.S. presidential administration and Congress result in ongoing regulatory uncertainties. There is no guarantee that our risk management and compliance programs will be consistently executed to successfully manage compliance risk. We also rely upon third parties who may expose us to compliance and legal risk. . . .

26. Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), CEO Moynihan and then-CFO Paul M. Donofrio signed and filed certifications, together with the 2020 10-K, attesting to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal controls, and the disclosure of all fraud.

27. On February 22, 2022, Bank of America filed its Annual Report on Form 10-K for the year ended December 31, 2021 (the "2021 10-K"), which was filed with SOX certifications signed by CEO Moynihan and CFO Borthwick. In Item 1A. Risk Factors, the 2021 10-K stated the following:

> We are subject to comprehensive regulation under federal and state laws in the U.S. and the laws of the various jurisdictions in which we operate, including increasing and complex economic sanctions regimes. These laws and regulations significantly affect and have the potential to restrict the scope of our existing businesses, limit our ability to pursue certain business opportunities, including the products and services we offer, reduce certain fees and rates or make our products and services more expensive for our clients. Additionally, we are required to file various financial and non-financial regulatory reports to comply with laws and rules in the jurisdictions in which we operate.
>
> * * * *
>
> While ***we believe that we have adopted appropriate risk management and compliance programs to identify, assess, monitor and report on employees conduct, applicable laws, policies and procedures***, compliance risks will continue to exist, particularly as we adapt to new and evolving laws, rules and regulations. Additionally, changing U.S. fiscal, monetary and regulatory policies, and evolving priorities, may result in ongoing regulatory uncertainties. There is no guarantee that our risk management and compliance programs will be consistently executed to successfully manage compliance risk. We also rely

> upon third parties who may expose us to compliance and legal risk.
> . . .

28. On February 22, 2023, Bank of America filed its Annual Report on Form 10-K for the year ended December 31, 2022 (the "2022 10-K"), which was filed with SOX certifications signed by CEO Moynihan and CFO Borthwick. In Item 1A. Risk Factors, the 2022 10-K stated the following:

> We are subject to evolving and comprehensive regulation under federal and state laws in the U.S. and the laws of the various jurisdictions in which we operate, including increasing and complex regulatory sanctions regimes. These laws and regulations significantly affect and have the potential to restrict the scope of our existing businesses, limit our ability to pursue certain business opportunities, including the products and services we offer, reduce certain fees and rates or make our products and services more expensive for our clients. We are also required to file various financial and non-financial regulatory reports to comply with laws, rules and regulations in the jurisdictions in which we operate.
>
> * * * *
>
> While ***we believe that we have adopted appropriate risk management and compliance programs***, compliance risks will continue to exist, particularly as we anticipate and adapt to new and evolving laws, rules and regulations. We also rely upon third parties who may expose us to compliance and legal risk. . . .

29. On February 20, 2024, Bank of America filed its Annual Report on Form 10-K for the year ended December 31, 2023 (the "2023 10-K"), which was filed with SOX certifications signed by CEO Moynihan and CFO Borthwick. The Company's 2023 10-K included the following risk disclosure in Item 1A. Risk Factors:

> Our businesses are highly regulated and we are subject to evolving and comprehensive regulation under federal and state laws in the U.S. and the laws of the various foreign jurisdictions in which we operate, including increasing and complex economic sanctions regimes . . . . We are also required to file various financial and nonfinancial regulatory reports to comply with laws, rules and regulations in the jurisdictions in which we operate, which results in additional compliance risk.

> * * * *
>
> ***Improper actions, behaviors or practices by us, our employees or representatives that are illegal, unethical or contrary to our core values could harm us, our shareholders or customers or damage the integrity of the financial markets, and are subject to regulatory scrutiny across jurisdictions***.
>
> * * * *
>
> ***While we believe that we have adopted appropriate risk management and compliance programs***, compliance risks will continue to exist, particularly as we anticipate and adapt to new and evolving laws, rules and regulations and evolving interpretations. We also rely upon third parties who may expose us to compliance and legal risk. . . .

30. On July 30, 2024, Bank of America filed its Quarterly Report on Form 10-Q for the quarter ended June 30, 2024 (the "2024 Q2 10-Q"), which was filed with SOX certifications signed by CEO Moynihan and CFO Borthwick.

31. In Item 5. Other Information, the 2024 Q2 10-Q stated that stated the following:

> Pursuant to Section 13(r) of the Exchange Act, an issuer is required to disclose in its annual or quarterly reports, as applicable, whether it or any of its affiliates knowingly engaged in certain activities, transactions or dealings relating to Iran or with individuals or entities designated pursuant to certain Executive Orders. Disclosure may be required even where the activities, transactions or dealings were conducted in compliance with applicable law. Except as set forth below, as of the date of this Quarterly Report on Form 10-Q, the Corporation is not aware of any other activity, transaction or dealing by any of its affiliates during the quarter ended June 30, 2024 that requires disclosure under Section 13(r) of the Exchange Act.
>
> During the second quarter of 2024, Bank of America, National Association (BANA), ***a U.S. subsidiary of Bank of America Corporation, processed 30 authorized wire payments totaling $8,094,375 pursuant to a general license issued by the U.S. Department of the Treasury's Office of Foreign Assets Control regarding Afghanistan or governing institutions in Afghanistan. These payments for three BANA clients were processed to Afghan state-owned banks which are subject to Executive Order 13224***. There was no measurable gross revenue or net profit to the

> Corporation relating to these transactions, except nominal fees received by BANA for processing payments. The Corporation may in the future engage in similar transactions for its clients to the extent permitted by U.S. law.

32. The 2024 Q2 10-Q also stated that there were "no material changes from the risk factors set forth under Part 1, Item 1A. Risk Factors of the Corporation's 2023 Annual Report[.]"

33. On October 29, 2024, Bank of America filed its Quarterly Report on Form 10-Q for the quarter ended September 30, 2025 (the "2024 Q3 10-Q"). Pursuant to SOX, CEO Moynihan and CFO Borthwick signed and filed certifications together with the 2024 Q3 10-Q attesting to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal controls, and the disclosure of all fraud. In Item 5. Other Information, the 2024 Q3 10-Q stated reiterated the following:

> Pursuant to Section 13(r) of the Exchange Act, an issuer is required to disclose in its annual or quarterly reports, as applicable, whether it or any of its affiliates knowingly engaged in certain activities, transactions or dealings relating to Iran or with individuals or entities designated pursuant to certain Executive Orders. Disclosure may be required even where the activities, transactions or dealings were conducted in compliance with applicable law. Except as set forth below, as of the date of this Quarterly Report on Form 10-Q, the Corporation is not aware of any other activity, transaction or dealing by any of its affiliates during the quarter ended September 30, 2024 that requires disclosure under Section 13(r) of the Exchange Act.
>
> During the third quarter of 2024, Bank of America, National Association (BANA), ***a U.S. subsidiary of Bank of America Corporation, processed 62 authorized wire payments totaling $8,268,181 pursuant to a general license issued by the U.S. Department of the Treasury's Office of Foreign Assets Control regarding Afghanistan or governing institutions in Afghanistan. These payments for two BANA clients were processed to Afghan state-owned banks, which are subject to Executive Order 13224. 61 of the 62 authorized wire payments originated from one BANA client using two accounts***. There was no measurable gross revenue or net profit to the Corporation relating to these transactions, except nominal fees received by BANA for processing payments. The

> Corporation may in the future engage in similar transactions for its clients to the extent permitted by U.S. law.

34. The 2024 Q3 10-Q also stated that there were "no material changes from the risk factors set forth under Part 1, Item 1A. Risk Factors of the Corporation's 2023 Annual Report[.]"

35. On February 25, 2025, Bank of America filed its Annual Report on Form 10-K for the year ended December 31, 2024 (the "2024 10-K"). Pursuant to SOX, CEO Moynihan and CFO Borthwick signed and filed certifications together with the 2024 10-K attesting to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal controls, and the disclosure of all fraud.

36. In Note 12 Commitments and Contingencies, the 2024 10-K stated that, "[b]ased on current knowledge, and taking into account accrued liabilities, management does not believe that loss contingencies arising from pending matters, including the matters described below, will have a material adverse effect on the consolidated financial condition or liquidity of the Corporation." In referencing commitment and contingencies related to the Consent Order, Bank of America stated:

> BANA agreed to a Consent Order announced by the Office of the Comptroller of the Currency (OCC) on December 23, 2024, and the Corporation continues to respond to requests for information from other regulators, relating to certain aspects of its BSA/AML and Economic Sanctions Compliance Programs (Programs). ***Since late 2023, the Corporation has been working with regulators to make changes to its Programs and has already completed significant steps to satisfy requirements of the Consent Order. The Corporation does not believe that these issues relating to the Programs will have a material adverse financial impact on the Corporation***.

37. In Item A1. Risk Factors, the 2024 10-K included substantially similar language referenced in ¶ 29, while further stating:

> The terms of settlements, orders and agreements that we have entered into with government entities and regulatory authorities

> have also imposed, or could impose, significant operational and compliance costs on us with respect to enhancements to our procedures and controls, losses with respect to fraudulent transactions perpetrated against our clients, expansion of our risk and control functions within our lines of business, investment in technology and the hiring of significant numbers of additional risk, control and compliance personnel. ***For example, in December 2024, the OCC issued a Consent Order against BANA relating to certain aspects of BANA's BSA, anti-money laundering and economic sanctions compliance programs, and we continue to respond to requests for information about similar aspects of such programs from other regulators. If we fail to meet the requirements of the regulatory settlements, orders or agreements to which we are subject, or, more generally, fail to maintain risk and control procedures and processes that meet the heightened standards established by our regulators and other government authorities, we could be required to enter into further settlements, orders or agreements and pay additional fines, penalties or judgments, or accept material regulatory restrictions on our businesses***.

38. On April 30, 2025, the Company filed its Quarterly Report on Form 10-Q for the quarter ended March 31, 2025 (the "2025 Q1 10-Q"), which was filed with SOX certifications signed by CEO Moynihan and CFO Borthwick. The 2025 Q1 10-Q stated that there were "no material changes from the risk factors set forth under Part 1, Item 1A. Risk Factors of the Corporation's 2024 Annual Report[.]"

39. On July 31, 2025, Bank of America filed its Quarterly Report on Form 10-Q for the quarter ended June 30, 2025 (the "2025 Q2 10-Q"), which was filed with SOX certifications signed by CEO Moynihan and CFO Borthwick. In Note 10, Commitments and Contingencies, the Company stated that, "[b]ased on current knowledge, and taking into account accrued liabilities, management does not believe that loss contingencies arising from pending matters, including the matters described below and in the prior commitments and contingencies disclosure, will have a material adverse effect on the consolidated financial condition or liquidity of the Corporation."

40. The referenced commitments and contingencies disclosure contained in Note 12 of the 2024 10-K included the statements about the Company's BSA/AML and sanctions compliance programs set forth in ¶ 37.

41. The 2024 Q2 10-Q also reiterated that there were "no material changes from the risk factors set forth under Part 1, Item 1A. Risk Factors of the Corporation's 2024 Annual Report[.]"

42. On October 31, 2025, the Company filed its Quarterly Report on Form 10-Q for the quarter ended September 30, 2025 (the "2025 Q2 10-Q"), which was filed with SOX certifications signed by CEO Moynihan and CFO Borthwick. In Note 10, Commitments and Contingencies, the Company stated that, "[b]ased on current knowledge, and taking into account accrued liabilities, management does not believe that loss contingencies arising from pending matters, including the matters described below and in the prior commitments and contingencies disclosure, will have a material adverse effect on the consolidated financial condition or liquidity of the Corporation."

43. The referenced commitments and contingencies disclosure contained in Note 12 of the 2024 10-K included the statements about the Company's BSA/AML and sanctions compliance programs set forth in ¶ 37.

44. The 2024 Q3 10-Q also assured investors that there were "no material changes from the risk factors set forth under Part 1, Item 1A. Risk Factors of the Corporation's 2024 Annual Report[.]"

45. On February 25, 2026, Bank of America filed its Annual Report on Form 10-K for the year ended December 31, 2025 (the "2025 10-K"), which was filed with SOX certifications signed by CEO Moynihan and CFO Borthwick. The 2025 10-K included language in Note 12, Commitments and Contingencies, substantially similar to the language set forth in ¶ 37.

46. In Item 1A. Risk Factors, the 2025 10-K stated the following:

> The terms of settlements, orders and agreements that we have entered into with government entities and regulatory authorities have also imposed, or could impose, significant operational and compliance costs, including enhancements to our procedures and controls, losses with respect to fraudulent transactions perpetrated against our clients, expansion of our risk and control functions within our lines of business, investment in technology and the hiring of significant numbers of additional risk, control and compliance personnel. ***For example, in December 2024, the OCC issued a Consent Order against BANA relating to certain aspects of its BSA, anti-money laundering and economic sanctions compliance programs, and we continue to respond to requests for information about similar aspects of such programs from other regulators. Failure to meet the requirements of such settlements, orders or agreements, or, more generally, the failure to maintain risk and control procedures and processes that meet the heightened standards established by our regulators and other government authorities, could result in further settlements, orders or agreements and additional fines, penalties or judgments, or material regulatory restrictions on our businesses***.

47. On May 1, 2026, Bank of America filed its Quarterly Report on Form 10-Q for the quarter ended March 31, 2026 (the "2026 Q1 10-Q"), which was filed with SOX certifications signed by CEO Moynihan and CFO Borthwick. In Note 10, Commitments and Contingencies, the 2026 Q1 10-Q stated, in relevant part:

> Based on current knowledge, and taking into account accrued liabilities, ***management does not believe that loss contingencies arising from pending matters, including the matters described below and in the prior commitments and contingencies disclosure, will have a material adverse effect on the consolidated financial condition or liquidity of the Corporation***.

48. The referenced commitments and contingencies disclosure contained in Note 12 of the 2025 10-K included the statements about the Company's BSA/AML and sanctions compliance programs set forth in ¶ 37.

49. The 2026 Q1 10-Q also stated that there were "no material changes from the risk factors set forth under Part 1, Item 1A. Risk Factors of the Corporation's 2025 Annual Report[.]"

50. Finally, on July 31, 2026, the Company filed its Quarterly Report on Form 10-Q for the quarter ended June 30, 2026 (the "2026 Q2 10-Q"), which was filed with SOX certifications signed by CEO Moynihan and CFO Borthwick. In Note 10, Commitments and Contingencies, the 2026 Q2 10-Q stated, in relevant part:

> Based on current knowledge, and taking into account accrued liabilities, ***management does not believe that loss contingencies arising from pending matters, including the matters described below and in the prior commitments and contingencies disclosure, will have a material adverse effect on the consolidated financial condition or liquidity of the Corporation***.

51. The referenced commitments and contingencies disclosure contained in Note 12 of the 2025 10-K included the statements about the Company's BSA/AML and sanctions compliance programs set forth in ¶ 37.

52. The 2026 Q2 10-Q also stated that there were "no material changes from the risk factors set forth under Part 1, Item 1A. Risk Factors of the Corporation's 2025 Annual Report[.]"

53. The above statements identified in ¶¶ 25-52 were materially false and/or misleading and failed to disclose material adverse facts about Bank of America's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading. Specifically, Defendants failed to disclose that: (1) Bank of America's BSA/AML compliance program was deficient and ineffective; (2) Bank of America had significant deficiencies in its suspicious-activity monitoring, investigation, and SAR-reporting processes; (3) Bank of America had failed to adequately remediate known compliance deficiencies, despite the prior Consent Order; (4) due to the foregoing, Bank of America faced heightened regulatory and financial exposure, and its business and operations were negatively impacted; and (5) as a result, Defendants' positive statements regarding the Company's business, operations, and

prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Is Revealed**

54. The truth was revealed after the markets closed on October 13, 2026, when the U.S. Department of the Treasury issued a press release announcing "enforcement actions imposing more than $1.21 billion in penalties against Bank of America" for "violations of anti-money laundering and sanctions laws." The press release included the consent order imposing the civil money penalty against the Company, which revealed that the Bank of America violations and misconduct took place from at least January 1, 2018 through July 1, 2025.

55. The enforcement actions revealed that BANA's compliance failures were widespread and longstanding. According to the press release, BANA admitted that it "willfully violated the BSA" by failing to maintain an anti-money laundering program that satisfied minimum regulatory requirements, failing to conduct required due diligence for certain foreign correspondent accounts, and failing to file SARs. BANA's "central failures" involved deficiencies in its suspicious-transaction monitoring and reporting and customer due diligence processes, which ultimately caused BANA to "fail[] to timely report to [the Financial Crimes Enforcement Network ("FinCEN")] over $5 billion [] in suspicious transactions," including "over $1 billion" involving "national security-related and other priority illicit finance risks."

56. The enforcement actions further revealed that BANA repeatedly prioritized business considerations over compliance obligations. As stated in the press release, "[a]s these issues arose, Bank of America prioritized its revenues and minimized the impact on its required compliance resources." BANA also became excessively reliant on "law enforcement inquiries, requests by other financial institutions, and similar interventions," rather than its own monitoring

systems to identify suspicious activity, effectively "outsourc[ing] to third parties a substantial portion of its proactive detection and reporting obligations." It was also found that BANA "allowed suspicious activity to accumulate uninvestigated for extended periods," resulting in delayed reporting that was of "limited utility to law enforcement."

57. As described in the press release, the OCC likewise found that BANA's BSA/AML compliance program was "deficient and ineffective." According to the OCC, deficiencies in transaction-monitoring system caused it to "fail[] to properly monitor trillions of dollars in transactions," resulting in "large numbers of late SARs involving billions of dollars." The OCC further found that BANA "knew for years that it was failing to escalate potentially suspicious activity to investigators for review to determine if a SAR should be filed but failed to correct this serious BSA violation." The OCC also determined that the Company's BSA Officer and staff "lacked sufficient skills and expertise to effectively manage its BSA/AML program."

58. Additionally, the enforcement actions revealed that BANA's compliance deficiencies persisted even after entry of the Consent Order. The OCC found that, "[a]fter agreeing to the 2024 Order, the Bank still failed to prioritize BSA/AML compliance," and "did not complete many of the significant steps needed to establish an effective BSA/AML compliance program and its program continues to have significant breakdowns."

59. The next day, before markets opened on October 14, 2026, Bank of America issued a press release announcing its financial results for the third quarter of 2026, reporting that the $1.2 billion regulatory settlement charge reduced diluted earnings per share by $0.17.

60. Analysts immediately reacted. For example, J.P. Morgan analysts issued a report titled "BSA/AML Consent Orders Include Surprising Comments From Regulators." The report stated that the "latest action is much more punitive because regulators concluded that BofA had

not made sufficient progress, failed to timely report more than $5 bil of suspicious activity to FinCEN, and controls across BSA/AML and sanctions compliance remained deficient and ineffective." The report further noted that the "deficiencies cited seem quite extensive," and that the "lack of oversight by the Board on this matter" was "also surprising."

61. On this news, the price of Bank of America common stock fell $2.57 per share, or about 4.7%, from a closing price of $53.96 per share on October 13, 2026, to a closing price of $51.39 per share on October 14, 2026, while the price of Bank of America Series QQ Depositary Shares fell $0.11 per share, or about 0.72%, from a closing price of $15.32 per share on October 13, 2026, to a closing price of $15.21 per share on October 14, 2026.

## CLASS ACTION ALLEGATIONS

62. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Bank of America common stock and/or Series QQ Depositary Shares between January 20, 2022 and October 13, 2026, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

63. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Throughout the Class Period, common stock of Bank of America actively traded on the NYSE under the ticker symbol "BAC." Throughout the Class Period, Bank of America Series QQ Depositary Shares actively traded on

the NYSE under the ticker symbol "BAC PrQ," and on the Nasdaq under the ticker symbol "BAC^Q." Millions of Bank of America shares were traded publicly during the Class Period on the NYSE and the Nasdaq. As of October 29, 2026, the Company had more than 6.9 billion shares of common stock outstanding. As of November 12, 2026, the Company had more than 51.9 million Series QQ Depositary Shares outstanding. Record owners and other members of the Class may be identified from records maintained by Bank of America, or its transfer agent, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

64. Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

65. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that conflict with those of the Class.

66. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Bank of America;

d) whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Bank of America;

e) whether the market prices of Bank of America common stock and Series QQ Depositary Shares during the Class Period were artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f) the extent to which the members of the Class have sustained damages and the proper measure of damages.

67. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## UNDISCLOSED ADVERSE INFORMATION

68. The market for Bank of America common stock and Series QQ Depositary Shares was an open, well-developed, and efficient market at all relevant times. As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, Bank of America common stock and Series QQ Depositary Shares traded at artificially inflated prices during the Class Period. Plaintiff's Wife, and the other members of the Class, purchased

Bank of America common stock and/or Series QQ Depositary Shares relying upon the integrity of the market prices of the Company's common stock and/or Series QQ Depositary Shares, and the market information relating to Bank of America, and have been damaged thereby.

69. During the Class Period, Defendants materially misled the investing public, thereby inflating the prices of the Company's common stock and Series QQ Depositary Shares, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information, and/or misrepresented the truth about Bank of America's business, operations, and prospects as alleged herein. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's common stock and Series QQ Depositary Shares to be overvalued and artificially inflated or maintained at all relevant times. Defendants' materially false and/or misleading statements directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff's Wife, and other members of the Class, who purchased the Company's common stock and/or Series QQ Depositary Shares at artificially inflated prices and were harmed when the truth was revealed.

## **SCIENTER ALLEGATIONS**

70. As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly

and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

71. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Bank of America, their control over, receipt, and/or modification of Bank of America's allegedly materially misleading statements and omissions, and/or their positions with the Company, which made them privy to confidential information concerning Bank of America, participated in the fraudulent scheme alleged herein.

## **INAPPLICABILITY OF STATUTORY SAFE HARBOR**

72. As a result of their purchases of Bank of America common stock and/or Series QQ Depositary Shares during the Class Period, Plaintiff's Wife, and other members of the Class, suffered economic loss, *i.e.*, damages, under the federal securities laws.

73. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Bank of America who knew that the statement was false when made.

## **LOSS CAUSATION**

74. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff's Wife and the Class.

75. As detailed herein, during the Class Period, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market. This artificially inflated the prices of Bank of America common stock and Series QQ Depositary Shares,

and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof, were disclosed to the market, the prices of Bank of America's common stock and Series QQ Depositary Shares fell precipitously, as the prior artificial inflation came out of the prices.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

76. The market for Bank of America common stock and Series QQ Depositary Shares was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Bank of America common stock and Series QQ Depositary Shares traded at artificially inflated and/or maintained prices during the Class Period. Plaintiff's Wife, and other members of the Class, purchased the Company's common stock and/or Series QQ Depositary Shares relying upon the integrity of the market prices of Bank of America common stock and/or Series QQ Depositary Shares, and market information relating to Bank of America, and have been damaged thereby.

77. At all times relevant, the market for Bank of America common stock and Series QQ Depositary Shares was an efficient market for the following reasons, among others:

a) Bank of America common stock and Series QQ Depositary Shares were listed and actively traded on the NYSE and/or the Nasdaq, highly efficient and automated markets;

b) As a regulated issuer, Bank of America filed periodic public reports with the SEC and/or the NYSE and/or the Nasdaq;

c) Bank of America regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services; and/or

d) Bank of America was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

78. As a result of the foregoing, the market for Bank of America common stock and Series QQ Depositary Shares promptly digested current information regarding Bank of America from all publicly available sources and reflected such information in the Company's common stock price and Series QQ Depositary Shares price. Under these circumstances, all purchasers of Bank of America common stock and/or Series QQ Depositary Shares during the Class Period suffered similar injury through their purchases of common stock and/or Series QQ Depositary Shares at artificially inflated prices, and a presumption of reliance applies.

79. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNTS AGAINST DEFENDANTS

## COUNT I

**For Violations of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder Against All Defendants**

80. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81. Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff's Wife and other Class members, as alleged herein; (ii) artificially inflate and maintain the market prices of Bank of America common stock and Series QQ Depositary Shares; and (iii) cause Plaintiff's Wife, and other members of the Class, to purchase Bank of America common stock and/or Series QQ Depositary Shares at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

82. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's common stock and/or Series QQ Depositary Shares in an effort to maintain artificially high market prices for Bank of America common stock and Series QQ Depositary Shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein, or as controlling persons as alleged below.

83. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Bank of America's

business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Bank of America's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Bank of America and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock and/or Series QQ Depositary Shares during the Class Period.

84. Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

85. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Bank of America's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained prices of its common stock and Series QQ Depositary Shares. As demonstrated by Defendants' misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

86. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market prices of Bank of America common stock and Series QQ Depositary Shares were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the markets in which the common stock and Series QQ Depositary Shares trade, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiff's Wife, and the other members of the Class, purchased Bank of America common stock and/or Series QQ Depositary Shares during the Class Period at artificially inflated prices and were damaged thereby.

87. At the time of said misrepresentations and omissions, Plaintiff's Wife and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff's Wife and the other members of the Class and the marketplace known of the truth regarding the

problems that Bank of America was experiencing, which were not disclosed by Defendants, Plaintiff's Wife and other members of the Class would not have purchased Bank of America common stock and/or Series QQ Depositary Shares, or, if they had purchased such shares during the Class Period, they would not have done so at the artificially inflated prices that they paid.

88. By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

89. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff's Wife and the other members of the Class suffered damages in connection with their purchases of the Company's common stock and/or Series QQ Depositary Shares during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against All Individual Defendants

90. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

91. The Individual Defendants acted as controlling persons of Bank of America within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by

Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

92. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

93. As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff's Wife, and the other members of the Class, suffered damages in connection with their purchases of the Company's common stock and/or Series QQ Depositary Shares during the Class Period.

## PRAYER FOR RELIEF

94. WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a) Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c) Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d) Awarding such other and further relief as this Court deems appropriate.

**JURY DEMAND**

95. Plaintiff demands a trial by jury.

Dated: November 12, 2026

Respectfully submitted,

By: */s/ Curtis V. Trinko*

**LAW OFFICES OF CURTIS V. TRINKO, LLP**
Curtis V. Trinko
39 Sintsink Drive West
First Floor
Port Washington, NY 11050
Tel.: (212) 490-9550
Fax: (212) 986-0158
ctrinko@trinko.com

*Counsel for Plaintiff Irving S. Braun*

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

Irving S. Braun ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing. Plaintiff has authorized the filing of a motion for appointment as lead plaintiff. Plaintiff is authorized to execute this certification pursuant to an assignment of claims from Judith Braun.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action.

Depositary Shares, each representing a 1/1,000th interest in a share of
4.250% Non-Cumulative Preferred Stock, Series QQ

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 05/02/2024 | 300 | $18.4800 |

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below: None.

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of November, 2026.

Irving S. Braun

**ASSIGNMENT**

Judith Braun ("Assignor") hereby assigns, transfers, and sets over to Irving S. Braun, Assignor's husband, all rights, title, and interest of the Assignor in any and all claims, demands, and causes of action of any kind whatsoever that the Assignor has or may have arising from violations under the federal securities laws of the United States of America in connection with the purchase or sale of the publicly traded securities of Bank of America Corporation. Assignor agrees to cooperate in the pursuit of such causes of action, including by providing documents and other discovery information that may be reasonably requested by Irving S. Braun. Further, the Assignor hereby appoints Irving S. Braun as her true and lawful attorney-in-fact for the purpose of exercising all powers relating to such causes of action. Irving S. Braun agrees to remit any proceeds received as a result of this assignment to the Assignor.

This Assignment (which is coupled with an interest) may not be revoked without the written consent of Irving S. Braun.

This Assignment shall be binding upon and inure to the benefit of the parties, their successors, and assigns.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of November, 2026.

Judith Braun, Assignor

Irving S. Braun, Assignee